**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHARISSE WILLIAMS** | ) |
| 16 Manchester Place, #303 | ) |
| Silver Spring, MD 20901 | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) CASE NO: <u>1:08-cv-00847</u> |
| | ) |
| | ) |
| **DAVID EISNER,** | ) |
| **CHIEF EXECUTIVE OFFICER FOR** | ) |
| **CORPORATION FOR NATIONAL AND** | ) |
| **COMMUNITY SERVICE** | **)** |
| | ) |
| 1201 New York Avenue, NW | ) |
| Suite 10800 | ) |
| Washington, D.C.  20525 | ) |
| Defendant | ) |

<u>**AMENDED**</u> <u>**COMPLAINT**</u>

(Hostile Work Environment, Employment retaliation, and wrongful termination)

<u>**JURY TRIAL DEMAND.**</u>

Plaintiff Charisse Williams by and through her counsel hereby files this Complaint and demands a jury trial against Defendant David Eisner, Chief Executive Officer for Corporation for National and Community Service Corporation (CNCS) for hostile work environment, employment retaliation and wrongful termination in violation of Title VII of the Federal Civil Rights Act and the CNSC Labor Management Agreement and states as follows:

**PARTIES**

1. Plaintiff Charisse Williams is a former Program Officer with the Americorps, a sister agency within the Corporation for National and Community Service (CNCS).

2. Plaintiff was employed with CNCS from January 2005 until Defendant terminated her employment on or around September 1, 2006.

3. Defendant David Eisner is the Chief Executive Officer for Corporation for National and Community Service (CNCS).

4. The Corporation for National and Community Service (CNCS is a federal agency that was created by the National and Community Service Trust Act of 1993.)

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, and 29 C. F. R. § 1614.110(b). Plaintiff received Defendant's Final Decision on February 15, 2008.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant's headquarters is located in Washington, D.C., and the acts and omissions of Defendant alleged below were committed within Washington, District of Columbia and within the geographical limits of the District of Columbia Division of this Court. Also, Plaintiff's work site with Defendant was located in Washington, D.C.

**ALLEGATIONS OF FACT COMMON TO ALL CLAIMS**

7. Defendant David Eisner is the Chief Executive Officer for CNCS and his current place of employment is located at 1201 New York Avenue, NW, Washington, D.C. 20525.

2

Service of process can be made by serving  CNCS General Counsel at 1201 New York Avenue, NW, Suite 106101, Washington, D.C. 20525.

8. Plaintiff (African American) begun her employment as a Program Officer with Defendant in January 2005 and was required to perform a two (2) year probationary period. Plaintiff immediately became a member of the local Union upon her employment and thus, her employment was governed by CNCS Labor Management Agreement Defendant terminated her employment on or around September 1, 2006.  Plaintiff's supervisor was Lois Nembhard, Defendant's Deputy Director. Plaintiff was the only African American female[1]  Program Officer on Ms. Nembhard's team located in the Washington, D.C. headquarters.

9.  Ms. Nembhard rated Plaintiff's one year performance as satisfactory and the comments on the evaluation indicated that Plaintiff was on target with her goals and performance duties and responsibilities.  Plaintiff's first year performance rating covered the period of October 1, 2004 through September 30, 2005.

10.   On or the latter part of November 2005, Ms. Nembhard directed Plaintiff to not only perform her caseload but also the caseload of another program officer who was on sick leave. Ms. Nembhard did not offer Plaintiff any assistance in completing the additional program officer's tasks and responsibilities.   Plaintiff realized that it became increasingly difficult to communicate with Ms. Nembhard and Plaintiff believed that Ms. Nembhard treated her differently because she assigned all of the problem portfolios to her.

---

[1] Charndrea Leonard was an African American Program Officer that worked under the supervision of Lois Nembhard. However, Ms. Leonard's work site was located in Dallas Texas and she traveled to Defendant's Washington, D.C. location approximately five to six times a year. Rosa Harrison was an African American Program Assistant and Lois Nembhard supervised her in 2005-2006.

11.  Also beginning in January 2006, Plaintiff observed that Ms. Nembhard exhibited a very hostile attitude toward her and other staff.  However, Ms. Nembhard exhibited a more pleasant demeanor to two other program officers who were females and Caucasian.

12.  During meetings, Ms. Nembhard refused to acknowledge any comments or questions from Plaintiff and often displayed a combative and mean spirited attitude toward Plaintiff during the staff meetings.  Ms. Nembhard often failed to correspond to any of Plaintiff's telephone calls, messages or emails.  Ms. Nembhard would often fail to acknowledge that Plaintiff was in her presence even though Plaintiff's work site was very close to Ms. Nembhard's office.

13. Plaintiff discussed Ms. Nembhard's attitude with other co-workers and their assessment of Ms. Nembhard was similar to Plaintiff.  Plaintiff and her co-workers agreed that it appeared that Ms. Nembhard simply failed to understand that her bad management style was causing low morale among the entire staff or simply did not care or appreciate the effect on her staff.

14.  Plaintiff at first attempted to ignore the hostility that Ms. Nembhard displayed toward her but then she begun to realize that the hostility was interfering with her job duties and responsibilities.

15. Plaintiff further realized that Ms. Nembhard's failure to communicate or provide her with guidance or direction became a hindrance to her in completing the job duties of two program officers.

16.  On or around January  2006 Plaintiff  meet with Defendant's Human Capital Resource Department (HR) and discussed the communication problems that she believed existed between her and Ms. Nembhard and Nembhard's hostile and harassing behavior. Plaintiff stated

that other co-workers had the same problems with Ms. Nembhard. Also, Plaintiff stated that Ms. Nembhard's mismanagement created an unpleasant and hostile work environment for her and several of her co-workers.

17. Defendant HR Specialist referred Plaintiff to Defendant's Alternative Dispute Resolution team. Plaintiff discussed with Defendant's Alternative Dispute Resolution team (ADR) that Ms. Nembhard show preferential treatment to two of her co-workers that were female and Caucasian and Nembhard often treated Plaintiff and other co-workers like they did not exist or had little regard for their desire to perform well. Also, Ms. Nembhard displayed a dislike and contempt for employees who was absent due to illness or need accommodations for a disability.

18. The ADR team suggested that a meeting with the entire staff and Ms. Nembhard could be helpful. Plaintiff agreed with this plan as long as her name was not mentioned to Ms. Nembhard as the one who initiated the contact with the ADR team. ADR also indicated that it would interview other staff and submit questionnaires to assess the overall working environment.

19. Thereafter, ADR contacted the entire staff but kept Plaintiff's identity confidential. The staff provided ADR with the same assessment of Ms. Nembhard's management style that Plaintiff had provided. Thus, based upon the overall staff's assessments, ADR contacted Ms. Nembhard to schedule a group facilitation meeting.

20. ADR requested Ms. Nembhard to schedule the group facilitation meeting. However, Ms. Nembhard failed to schedule the group facilitation meeting on two occasions.

21. Plaintiff continued to keep ADR informed of Ms. Nembhard's behavior and ineffective management styles. For example, Nembhard appeared to target Plaintiff during staff

meeting by talking to her in a rude, angry, belittling and intimating manner. The negative environment and Nembhard's harassment took a toll on Plaintiff because she developed migraine headaches and had constant stomach pains. Plaintiff indicated to ADR that she believed that Ms. Nembhard's behavior toward her [2]appeared to be personal but she was unsure whether it was because of her race (African American) or her color (fair-skinned) or Nembhard simply did not like her. However, Plaintiff stated that Ms. Nembhard's actions had nothing to do with performance because she believed that she was performing her job in an excellent manner despite no direction or guidance from Ms. Nembhard.

22. Finally, ADR persuaded Plaintiff to have a one- on -one facilitation with Ms. Nembhard.  Plaintiff on several occasions refused this arrangement because she feared that Ms. Nembhard's hostility and harassment would increase. However, Plaintiff finally agreed to the ADR facilitation.

23. The ADR facilitation between Plaintiff and Ms. Nembhard occurred on or around the second  or third week in March 2006. Both Plaintiff and Ms. Nembhard signed a non-retaliation agreement prior to the facilitation.  During the facilitation, Plaintiff gave concrete examples of Nembhard's lack of management or guidance and lack of communication with the staff that included describing Nembhard's management style as cold, demeaning, disrespectful and abrasive.  Also, Plaintiff indicated that Nembhard's actions could be described as gross mismanagement.

---

[2]  Lois Nembhard is Black (dark-skinned) but it appeared to Plaintiff and others that Nembhard did not consider herself an African American because Nembhard's nationality is Jamaican.

24.  Nembhard resisted all settlements efforts and stated to Plaintiff that she was the problem and if there was low morale among the staff then Plaintiff created it and Plaintiff had to go.

25.  Thus, the ADR session was not effective and there was no settlement or agreement. ADR offered to find solutions so Plaintiff would have a better working environment and relationship with Nembhard but Nembhard rejected all the solutions and or options that ADR offered. Plaintiff was very upset and shaken and believed that because Nembhard reacted negative throughout the entire session that her work environment would not get better but worse. The ADR counselor also realized that the session did not go as planned and advised Plaintiff to immediately start looking for new employment.

26. Shortly after the March 2006 ADA facilitation session,  Defendant referred Nembhard to attend a sensitivity and management skills class.  Plaintiff  believes that Nembhard attended the training program for approximately  two to three weeks since Nembhard was absence from the office from the middle part of March 2006 until on or around the first week in April 2006.

27. On or around the first or second week in April 2006, Plaintiff was requested to report to Defendant's Human Resource Office for a personnel meeting with Nembhard and John Rogers, Defendant's  Senior Human Resource Specialist. During this meeting, Nembhard delivered Plaintiff's mid-term performance evaluation. The mid-year performance evaluation rated Plaintiff's performance as unsatisfactory.

28.  Nembhard proceeded to provide a summary of the laundry list of Plaintiff's shortcomings as a Program Officers.  However, Nembhard did not indicate that Plaintiff's

employment was terminated or indicate ways that Plaintiff could improve her performance. Nembhard nor Plaintiff signed the midyear evaluation during the evaluation meeting. John Rogers then asked Plaintiff whether she had any questions. Plaintiff was so shocked and disappointed that she became speechless and decided it was best not to challenge Nembhard and make the situation worse.

29. After Nembhard left the meeting, Plaintiff revealed to Mr. Rogers that at least ninety (90%) on her mid-year performance evaluation was false because: (a) Plaintiff's mid-year evaluation was the exact opposite of her prior one-year employee evaluation; (b) there had been no prior verbal or written feedback from Ms. Nembhard or anyone regarding any unsatisfactory performance issues or any discussion of the derogatory information listed on the mid-year evaluation; and (c) Nembhard and others had lead Plaintiff to believe that her work performance was on target and she was excelling in her job performance.

30. Also, Plaintiff stated to John Rogers that she believed that the unsatisfactory performance evaluation was Ms. Nembhard's attempt to retaliate against her for protective disclosures during the one on one ADR session.

31. Plaintiff asked John Rogers whether her unsuccessful evaluation rating meant that she was terminated. John Rogers answered Plaintiff's question by discussing Defendant's progressive performance process and assured Plaintiff that all employees that receive an unsatisfactory performance rating are given an opportunity to improve their performance prior to termination.

32. John Rogers stated that Nembhard would probably provide Plaintiff with a written performance improvement plan (PIP) that would last from 30 to 90 days in accordance with the

the Labor Management Agreement.  Rogers further stated that during  the PIP period there would be mandated scheduled meetings whereby the supervisor would counsel the employee and provide verbal and written feedback to the employee regarding his/her performance.  After the PIP period ended, the supervisor provides a written evaluation and determines whether the subordinate successfully improved their performance.

33.  Mr. Rogers then referred Plaintiff to Employee Assistance Program (EAP) to obtain treatment and counseling for her stress.

34.   After the midyear evaluation meeting (during the first or second week in April 2006), Nembhard never presented Plaintiff with a Performance Improvement Plan (PIP). Also, Nembhard never mentioned the  unsatisfactory performance rating with Plaintiff. Plaintiff's caseload did not decrease and Nembhard did not reassign any of Plaintiffs cases. Plaintiff continued performing her job duties and the job duties of a co-worker.

35. After the midyear evaluation meeting, Nembhard never indicated to Plaintiff that her work performance was unsatisfactory or needed improvement.  Nembhard never mentioned any problem areas or deficiencies or ways that Plaintiff could improve her performance rating. Also, Nembhard never provided Plaintiff with any feedback regarding performance deficiencies or unsatisfactory performance.

36. On or around the beginning of August 2006, Lois Nembhard requested Plaintiff to accompany her to Defendant's Human Capital Resource Office (HR). Upon arrival at HR, Robert Sam, Defendant's Senior Human Relations Specialist informed Plaintiff that she was being terminated immediately for performance reasons pursuant to her mid-year performance evaluation. Also, Robert Sam indicated to Plaintiff that she would be allowed to change the

status of her HR record (Form 52) to indicate that she had resigned and not terminated. However, even though Plaintiff requested that Form 52 indicated that she resigned, Defendant instead indicated on Form 52 that Plaintiff resigned in lieu of being involuntary terminated.

37.  On August 29, 2006, Plaintiff contacted an EEO Counselor. EEO counseling was conducted on October 5, 2006 and concluded on November 30, 2006.  However, Plaintiff believes that she received the EEO's final report on or around January 17, 2007. Plaintiff complained that Defendant terminated her employment because of her protective disclosures that she made during her one on one ADR facilitation session with Lois Nembhard and protective disclosures that she made to Defendant's HR office.

38. Plaintiff filed a formal complaint on February 1, 2007.  Plaintiff in her formal complaint alleged that Defendant  retaliated against her when it terminated her employment because of her protective disclosures during  an ADR facilitation session and disclosures she made  to Defendant  HR office after her mid-year evaluation. Plaintiff further alleged that Defendant harassed and created a hostile work environment because of her protective disclosures.  Defendant dismissed Plaintiff's hostile work environment claim but reinstated this claim on September 7, 2007.

39.  Defendant investigated Plaintiff's retaliation allegations from April 20, 2007 until July 2007.  Defendant investigated Plaintiff's harassment and hostile work environment claims from September 2007 until October 2007.

40.  The EEO counselor's report and the Investigative report did not provide a conclusion as to whether retaliation had occurred. Both the EEO report and Investigative report only contained affidavits of both parties.

41.  On December 12, 2007, Defendant received Plaintiff's request that Defendant render a final decision regarding this matter.  On February 16, 2008, Plaintiff received Defendant's final agency decision that held that no discrimination occurred.

## COUNT I

(Hostile work environment )

42.  Plaintiff incorporates by reference the allegations in all proceeding paragraphs as if restated fully herein.

43.  Beginning in January 2006, the communication problems between Plaintiff and Lois Nembhard begun to surface. Also, the working relationship between Plaintiff and Ms. Nembhard begun to suffer.

44.  Ms. Nembhard began assigning all of the problem portfolios to Plaintiff  and even ordered Plaintiff to take over the caseload of another Program Officer, Merribeth Pentasuglia.

45. Plaintiff on several occasions requested direction and assistance from Ms. Nembhard relating to her job duties and workload and Ms. Nembhard simply ignored her and failed to offer Plaintiff any guidance or direction.

46. Beginning in January 2006, Plaintiff would try to obtain information relating to her caseload and the organization during staff meetings.  However, Nembhard would respond in a harsh and rude matter and caused Plaintiff embarrassment and humiliation. During staff meetings, Nembhard would often roll her eyes at Plaintiff and would not allow Plaintiff  to offer her opinion or participate in any meaningful discussions regarding Defendant's organization.

47.  Nembhard also failed to enroll or allow Plaintiff to attend any training courses to assist Plaintiff in carrying out her job duties and responsibilities.

48.  Plaintiff after discussing Nembhard's behavior with other co-workers realized that other staff  believed that Nembhard was simply a bad manager and had poor and ineffective management and people's skills.

49.  Nembhard became very agitated when Plaintiff and others requested sick leave  and even ordered Plaintiff to request advance  sick leave or leave to attend Physician's appointment.

50.  Nembard's lack of direction or guidance begun to interfere with Plaintiff performing her job duties and responsibilities and her eagerness to successfully perform her job.

51.  Plaintiff observed that Nembhard provided preferential treatment to a Team Leader and a Program Officers[3]  that were females and Caucasian and Nembhard often assisted and provided them with guidance, direction and respect.

52. Nembhard consistently harassed Plaintiff whenever Plaintiff took sick leave or had to attend a doctor's appointments.

53.  Nembhard's interaction with Plaintiff was minimal even though Plaintiff's work station was extremely close to Nembhard's office. However, whenever Nembhard interacted with Plaintiff  it was usually a very negative and intimidating encounter.

54.  Nembhard's  obvious dislike and disrespect for Plaintiff allowed another co-worker, Erin Dahlin  to argue, disrespect and belittle Plaintiff.

55.  After Plaintiff made the protective disclosures during the ADR facilitation session, Nembhard  continued to create a hostile work environment for Plaintiff by: (a) providing an unjustified unsatisfactory performance evaluation; (b) failing to even speak to Plaintiff; (c) charging Plaintiff with absence without leave (AWOL) for a doctor's appointment; (d) requiring Plaintiff to provide her with advance notice for sick and physician appointments even when

---

[3] Sueko Kumagai and Erin Dahlin were Lois Nembhar's favorite staffers.

Nembhard was not in the office; (e) failed to provide Plaintiff with any written or oral feedback regarding her alleged unsatisfactory employment; and (f) terminating Plaintiff's employment without first providing her with an opportunity to improve her alleged unacceptable performance.

### COUNT II

### (*Retaliation Employment*)

56. Plaintiff incorporates by reference the allegations in all proceeding paragraphs as if restated fully herein.

57. Plaintiff was unsure on the reason that Lois Nembhard treated her differently but she was sure that something needed to be done because Ms. Nembhard's mismanagement and communication problems not only affected her but the entire staff. Thus, Plaintiff went to Defendant's Office of Human Capital Resource (HR) to seek resolution for the communication and mismanagement problems that was occurring within the agency. Plaintiff stated to the HR Specialist that she believed that she was performing exceptionally well with respect to her additional job duties and responsibilities. However, Lois Nembhard's lack of management and communication skills were creating a hostile work environment for her and interfering with her ability and desire to perform her job. Plaintiff further stated to the HR specialist that she did not wish to be identified with respect to soliciting assistance in resolving the mismanagement and communication issues. Defendant's HR office referred her to a ADR counselor[4] to seek resolution to this matter.

58. During the initial conference with the ADR counselor, Plaintiff stated that she believed that Ms. Nembhard's mismanagement and communication problems was affecting

---

[4] Jodi Ovca was the ADR counselor (an agency contractor).

Defendant's entire organization. Also, Plaintiff stated that she was unsure on why Nembhard

harassed her or subjected her to a hostile work environment but Plaintiff was the only African

American Program officer at Defendant's Washington, D.C. location. Plaintiff further stated that

Nembhard displayed a negative attitude when Plaintiff requested sick leave to attend Physician's

appointments  and had problems accommodating employees who had disabilities. Plaintiff also

indicated to the ADR counselor that Nembhard show preferential treatment to two (2) female

Caucasian employees since Nembhard consistently provided them with guidance, leadership and

direction.  Nembhard also ensured that her favorite staffers received the proper training for their

jobs.

59.  Plaintiff believed that the best approach would be that the ADR counselor schedule a

group facilitation session with Ms. Nembhard.  However, the group facilitation session never

occurred because Nembhard failed to schedule it.

60.  Plaintiff kept in contact with the ADR counselor and the counselor convinced

Plaintiff to have a one on one session with Nembhard because at this point, Nembhard's

harassment, mismanagement and failure to direct or guide Plaintiff appeared to be personal.

Also, the ADR counselor believed that a one on one facilitation might even improve the working

relationship between Plaintiff and Nembhard.

61.  Plaintiff believes the ADR session occurred during the second  or third week in

March 2006.  Both Plaintiff and Ms. Nembhard were ordered to sign non-retaliatory statements

with respect to the disclosures made during the session.

62.The ADR session was not successful and the ADR counselor even advised Plaintiff to

immediately seek new employment.

63. Shortly after the ADR session, Nembhard was ordered to attend a management and sensitivity training class and was away from the office for approximately two to three weeks.

64. Also, shortly after the ADR session with Plaintiff, Nembhard begun to solicit from other personnel any comments, statements or documents that shed a negative light on Plaintiff's employment. (**Exhibit 1**).

65. On or around the first or second week in April 2006, Lois Nembhard presented Plaintiff with an unsatisfactory mid-year evaluation (**Exhibit 2**). Plaintiff was afraid to make any comments to the mid-year evaluation in Nembhard's presence because she believed that Nembhard might immediately terminate her employment.

66. During this performance evaluation meeting in early April 2006, Nembhard nor Plaintiff signed the mid-year evaluation. However, the midyear evaluation did not suggest that Plaintiff would be terminated. The midyear evaluation did indicate that Plaintiff must improve in all areas but Nembhard never provided any oral or written feedback regarding how Plaintiff could improve her performance. Also, Nembhard never provided a written PIP to Plaintiff.

67. Plaintiff's mid-year evaluation contained only allegations and Nembhard failed to provide any documents to justify the unsatisfactory rating. Nembhard failed to indicate the dates or projects that Plaintiff failed to process on a timely basis. Also, Nembhard failed to list the grantees that indicated that Plaintiff failed to respond in a timely manner to request for information. Nembhard failed to indicate or identify the program officers that stated that Plaintiff's negativity had a negative impact on their work environment. Also, Nembhard failed to identify the team leaders that indicated that Plaintiff was not interested on taking on additional projects. Apparently, Nembhard provided documents to allegedly support Plaintiff's mid-term

15

evaluation on June 8, 2007 (approximately a year and two months after Nembhard provided Plaintiff with the mid-year unsatisfactory performance rating) (**Exhibit 3**).  Nembhard never mentioned or shared any of the peer review evaluations (attached in **Exhibit 3**) with Plaintiff during Plaintiff's employment.

68. Nembhard evaluated other Program Officers that had not made any protected disclosures. Nembhard indicated on the Program Officers' performance evaluation that they had failed to respond and process their cases in a timely manner, had difficulties working with grantees and received negative comments from grantees and negative peer review evaluations. However, Nembhard provided the Program Officers who had not made protected disclosures with either a Exceeds Fully Successful (ES) rating or a Fully Successful(FS) performance rating.

69. Immediately, after Nembhard left the evaluation meeting, Plaintiff stated to John Rogers that she believed that the unsatisfactory performance evaluation was Ms. Nembhard's attempt to retaliate against her for protective disclosures during the one on one ADR session because at least 90% of the information on the mid-year evaluation was false.  Also, Plaintiff mentioned to John Rogers that her first year performance rating had been the exact opposite of her mid-year evaluation.

70.  John Rogers indicated to Plaintiff that the mid-year unsatisfactory rating did not suggest immediate termination and Nembhard would provide her with an opportunity to improve her performance.

71. Lois Nembhard did not reduce or reassign any portfolios or cases from Plaintiff after the delivery of the mid-year unsatisfactory rating during the early part of April 2006. Also, Nembhard also did not provide Plaintiff with any feedback.  However, Nembhard indicated  all

16

of Plaintiff's cases were updated and or current  after the mid-year evaluation meeting and Nembhard never  indicated in writing or orally that Plaintiff was performing her job unsatisfactory.

72.  Lois Nembhard wrote a memorandum  dated April 11, 2006 to Plaintiff regarding Plaintiff's use of leave (**Exhibit 4**).  Plaintiff received this memorandum on April 17, 2006. Also, Nembhard charged Plaintiff with eight (8) hours of  unapproved leave (AWOL) even though Plaintiff  used her leave to attend a Physician appointment and she telecommuted for the remaining day. Plaintiff had requested the leave through the proper channels. Plaintiff reported this matter to her collective bargaining unit. However, a union representative stated that managers had discretion to charged Plaintiff's leave as AWOL but Nembhard's action appear to be unusual, improper and petty.

73. Nembhard did not require other Program Officers to provide her advance notice of sick leave or Physician's appointments[5] even when Nembhard was not physically in the office.

74.  Nembhard failed to provide Plaintiff with a PIP or any written or oral feedback or comments relating to her performance after the midyear evaluation.

75.  Plaintiff received Defendant's notice of her termination on August 8, 2006. The notice stated that Plaintiff's employment was being terminated because of her failure to improve her overall performance, despite constructive feedback and opportunities to improve.[6]

---

[5] Plaintiff suffered from an illness that required constant monitoring and  medical treatment.

[6] Lois Nembhard also indicated in the letter of termination that she considered the following factors in terminating Plaintiff's performance: (a) memorandum of counseling dated April 10, 2006; (b) 2006  mid year EAS appraisal; and ( c) Plaintiff's failure to effectively communicate with her co-workers and customers that resulted in significant negative impact on the efficiency and morale of the AmeriCorps National staff team.

76. The letter did not provide any justification for Nembhard's statement that Plaintiff failed to improve her overall performance. Also, Nembhard did not provide any oral or written evidence showing that she provided Plaintiff with constructive feedback and opportunities to improve especially.

77. Lois Nembhard never provided any written or constructive feedback regarding Plaintiff's alleged unacceptable performance after the mid-year evaluation meeting(on or around the first or second week of April 2006).

78. Nembhard failed to provide Plaintiff with a PIP or evaluated Plaintiff's performance for the period of April 1, 2006 through August 8, 2006.

79. Nembhard never provided any credible evidence or information that justified rating Plaintiff's mid-year evaluation as unsatisfactory or terminating her employment. However, the evidence in this matter clearly shows that Plaintiff made protective disclosures during the ADR facilitation session on or around the second or third week in March 2006 and Nembhard never rated Plaintiff's performance as unsatisfactory until Plaintiff's mid-year performance evaluation (on or around the second week in April 2006) that occurred after Plaintiff's protective disclosures.

80. Nembhard did not evaluate Plaintiff's performance after the mid-year evaluation and thus, Nembard's statements that Plaintiff was terminated because she did not improve her performance after the mid-year evaluation are erroneous.

## COUNT III

(*Wrongful termination in violation of Title VII and the Labor Management Agreement*)

81.  Plaintiff incorporates by reference the allegations in all proceeding paragraphs as if restated fully herein.

82.  Lois Nembhard knew that Plaintiff was the only subordinate that had disclosed to Defendant's HR office and an ADR counselor that Nembhard had poor management and communication skills, Nembhard failed to provide Plaintiff's guidance and direction and Nembhard's mismanagement created a hostile work environment for the division and caused low morale among the entire staff.

83.  Lois Nembhard provided sworn testimony that Plaintiff was the only employee that she provided an unsatisfactory mid year performance evaluation. Nembhard expressed and wrote comments on other employees' evaluation similar to comments made on Plaintiff's mid-year evaluation. However, Nembhard did not provide unsatisfactory performance ratings to these employees.  Nembhard also admitted that in 2006 she only terminated Plaintiff's employment.

84.  Thus, even though Plaintiff and other employees had similar performance issues, Plaintiff was the employee that made protective disclosures regarding Nembhard's mismanagement and Plaintiff was the only subordinate that Nembhard gave an unsatisfactory performance rating and terminated.

85.  Article 4 of Defendant's Labor and Management Agreement provides that Defendant is prohibited from taking or threatening to take any personnel action because of any protected disclosure of information.  Because of exercising an appeal right or taking a personnel action that violate a law, rule or regulation regarding the merit system's principles. Section H of Article

3 of the Labor-Management Agreement provides that CNCS employees have the right to communicate freely with various Human Resource Departments including inter alia Alternative Dispute Resolution communication. Section A of Article 3 of the Labor-Management Agreement provides that employees and supervisors have the right to be treated with dignity and respect. No employee or supervisor shall have to tolerate harassment, abusive language or conduct, intimidation, discrimination or reprisal.

86.  Article 13, Section H of Defendant's Labor-Management Agreement provides that when an employee receives an unacceptable performance rating they must be given an opportunity to improve and correct any performance deficiencies, normally 30 to 90 days. Article 13 does not distinguish between non-probationary employees and probationary employees. This provision clearly covers all employees  except managers and coverage begins on their first day of employment.

87.  Lois Nembhard admitted that she never provided Plaintiff with a performance improvement plan. Defendant argues that because Plaintiff was still on probation, it did not have to provide a PIP for her.  However, this argument contradicts the Labor Management Agreement.  Article 26 of the Labor Management Agreement provides that where conflicts exist between CNCS policy and the Labor Management Agreement, the Agreement shall be controlling for bargaining unit employees.

88.  Defendant wrongfully terminated Plaintiff's employment because it  not only violated several provisions of  its' Labor Management Agreement but it failed to provide notice or advise Plaintiff of her right to file a grievance (since she was a member of the bargaining unit)

20

and her right to file an action regarding Defendant's prohibited personnel practice and retaliation with the Office of Special Counsel in accordance with 5 U.S.C. §2302(b)[7].

89. Defendant's termination letter to Plaintiff violated Article 11 of the Labor Management Agreement because the letter failed to provide the name of a designated CNCS representative with whom Plaintiff could discuss in detail, the reasons for the separation and notice of Plaintiff's right to have a union representative at the meeting to specifically discuss the rationale for the termination. Also, Defendant failed to advise Plaintiff of her right to appeal her termination on the ground that her termination was not done in accordance with the procedural requirements of the Labor Management Agreement.

90. As a result of Defendant's harassment, creation of a hostile work environment, retaliation and wrongful termination Plaintiff suffered physical and mental anguish, wage loss, financial loss and other compensatory damages and has been unable to find comparable employment with any federal or state government.

---

[7] Plaintiff agreed to the ADR one-on-one facilitation session because Lois Nembhard's mismanagement and harassment begun to interfere with her job duties and responsibilities and she believed that Nembhard's actions were personal. However, Plaintiff disclosed that she did not know whether Nembhard was treating her differently because of her race or color but she was sure that it had nothing to do with her performance. However, initially Plaintiff disclosed to the ADR counselor that she reasonably believed Nembhard's mismanagement was creating a hostile work environment for the entire staff and Nembhard's poor management and communication skills were causing low morale among the entire staff, constituted mismanagement, an abuse of authority and impended the progress and operation of the agency. These disclosures were protective under 5U.S.C. §2302(b).

**PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff Charisse Williams demands judgment against Defendant

David Eisner, Chief Executive Officer for the Corporation for National and Community Service

for damages including compensatory damages in an amount to be determined at trial but

believed to exceed Two Hundred and Ninety Thousand Dollars  ($290,000.00); her cost in this

action, back and front pay, statutory damages plus her reasonable attorney's fees and such other

relief as justice requires.

I, Charisse Williams acknowledge that the above information is correct and true to the best

of my knowledge and information.

/s/ Charisse Williams                          05/15/2008
Charisse Williams                              Date

                                               Respectfully submitted


                                               /s/ L. Saundra White
                                               L. Saundra White,
                                               Federal Bar # MD012370
                                               3540 Crain Highway, #107
                                               Bowie, MD 20716
                                               (301) 574-3547
                                               (240) 455–6491(Fax No)
                                               E-mail: WhiteLegalGrp@aol.com