## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHARISSE WILLIAMS,

     **Plaintiff,**

       v.

WENDY SPENCER[1]
Chief Executive Officer
Corporation for National and
Community Service,

     **Defendant.**

Civil No. 08-0847 (JDB)

## MEMORANDUM OPINION

Plaintiff Charisse Williams, an African-American woman, brings suit against Wendy Spencer, in her official capacity as the Chief Executive Officer of the Corporation for National and Community Service ("CNCS"), a federal agency established in 1993.  Plaintiff alleges hostile work environment and retaliation under Title VII of the Civil Rights Act.  She also asserts a claim for "wrongful termination" in violation of Title VII and the CNCS Labor Management Agreement.  Plaintiff alleges that she was retaliated against and subjected to a hostile work environment because of the "protective disclosures" she made to defendant's Human Capital Resource Department ("HR") and during several alternative dispute resolution ("ADR") sessions.

---

[1] The amended complaint originally named as the defendant David Eisner in his capacity as Chief Executive Officer of the Corporation for National and Community Service. Pursuant to Fed. R. Civ. P. 25(d), the current CEO Wendy Spencer is automatically substituted as defendant.

Defendant ("CNCS") filed a motion to dismiss or, in the alternative, for summary judgment. The Court will grant defendant's summary judgment motion as to all claims for the reasons stated below.

## I.    FACTS

Plaintiff was hired on January 18, 2005, as a Program Officer for AmeriCorps, a sister agency of CNCS. Am. Compl. ¶ 8; Def.'s Mem. in Support of Def.'s Mot. Summ. J. ("Def.'s Mot.") at 3. During plaintiff's first year on the job, she received a "satisfactory" rating in her first-year performance evaluation. Def.'s Mot. at 4 & Attach. 1 ("Nembhard Decl.") ¶ 11. However, beginning in late 2005 plaintiff ran into difficulties with her supervisor, Lois Nembhard, Deputy Director of CNCS.  Am. Compl. ¶ 10; Pl.'s Supp. Mem. Opp'n to Def.'s Mot. ("Pl.'s Opp'n") at 1. By January 2006, plaintiff claims that Nembhard had become "very hostile toward her and other staff." Am. Compl. ¶ 11. For example, plaintiff contends that Nembhard ignored and humiliated her during staff meetings and failed to respond to any of her correspondence. Id. ¶¶ 45-47. Because of these communication problems, plaintiff arranged a meeting with HR in which she discussed her supervisor's "hostile and harassing behavior." Id. ¶ 16.

HR referred plaintiff to the office's ADR team. Id. ¶ 17. Plaintiff shared her beliefs with the team that Nembhard, a Jamaican woman, showed preferential treatment to two co-workers who were Caucasian women. Id. ¶ 17 & ¶ 21 n.2. Plaintiff alleges she also told the ADR team:

> that she believed that Ms. Nembhard's behavior toward her appeared to be personal but she was unsure whether it was because of her race (African American) or her color (fair-skinned) or Nembhard simply did not like her.

Id. ¶ 21. The CNCS ADR Facilitator and Mediator, Jodi Ovca, stated that plaintiff never raised the subject of race or color discrimination in any of their conversations. Def.'s Mot., Attach. 3 (Aff. of Jodi Ovca), ¶¶ 13-14 ("Ovca Aff.").

Following multiple conversations with Ovca, plaintiff agreed to participate in a one-on-one ADR session with Nembhard, which took place in March 2006. Am. Compl. ¶¶ 22-23. During that session, plaintiff discussed Nembhard's "lack of management or guidance and lack of communication" and described her management style as "cold, demeaning, disrespectful and abrasive." Id. ¶ 23. There was no settlement or agreement after the ADR session, and plaintiff asserts that it actually worsened their already strained relationship. Pl.'s Opp'n at 5.

After the ADR session, Nembhard stopping talking to her and started giving her a hard time about her use of sick leave. See Am. Compl. ¶ 55. In April 2006, Nembhard wrote plaintiff a memo laying out requirements for her use of sick leave that plaintiff claims did not apply to other Program Officers. Id. ¶¶ 72-73; Ex. F to Nembhard Decl. (Mem. of Counseling – Use of Leave Concerns).  Nembhard also allegedly charged plaintiff with eight hours of unapproved leave (AWOL) even though plaintiff says she requested the leave through the proper channels, used her time off to attend a doctor's appointment, and telecommuted the rest of the day. Am. Compl. ¶ 72. That same month,[2] plaintiff received an "unsatisfactory" mid-year performance evaluation, which she says was in retaliation for the "protective disclosures" she had made during ADR and not based on her job performance. Id. ¶¶ 29-30; Ex. D to Nembhard Decl. (Performance Evaluation). Plaintiff insists that she was a hardworking and successful employee and submits affidavits from her colleagues to support that claim. Pl.'s Opp'n at 5, see also Pl.'s

_____

[2] While plaintiff says she received her mid-year performance evaluation in April 2006, defendant contends that plaintiff received her negative performance evaluation on June 7, 2006. Compare Am. Compl. ¶¶ 27-28 with Def.'s Mot. at 8-9.

3

Opp'n, Exs. 3-5.[3] Defendant, on the other hand, stands by its performance assessment, providing specific examples of missed deadlines, unscheduled leave, negative interactions with co-workers, and complaints from grantees.[4] Def.'s Mot. at 9 & Exs. A-D.

In August 2006, plaintiff was terminated from her job at CNCS. Am. Compl. ¶¶ 75-80. Her notice of termination states that she was terminated for: (1) failure to complete assigned tasks in a timely manner and meet customer expectations; (2) failure to participate in team projects and tasks; (3) failure to effectively communicate with co-workers and customers; and (4) failure to respond to management's requests. Ex. E to Nembhard Decl. (Notice of Probationary Removal).

On August 29, 2006, plaintiff contacted an Equal Employment Opportunity ("EEO") counselor. Am. Compl. ¶ 37. In February 2007, she filed a formal complaint against CNCS with the Equal Employment Opportunity Commission ("EEOC") that asserted discrimination claims based on "reprisal for participation in the discrimination complaint process" and "hostile work environment." Id. ¶ 38; Pl.'s Opp'n, Ex. 7 (Complaint of Discrimination).   The EEOC issued a decision in February 2008 concluding that plaintiff "was not subjected to discrimination based on reprisal or subjected to a hostile work environment." Def.'s Mot., Attach. 8 (Final Agency Decision) at 12; Am. Compl. at ¶ 41.

---

[3] These same affidavits, however, show that plaintiff's co-workers did notice a decline in plaintiff's demeanor at work. See Pl.'s Opp'n, Ex. 4 ("Guzman Aff.") ("Over the time, [Williams] became hostile and it became difficult to work with Ms. Williams because she would become angry about what was going on in the office . . . .").

[4] Plaintiff's supervisor asserts that in January 2006, she began receiving complaints from plaintiff's co-workers that plaintiff was "difficult to work with." Nembhard Decl. ¶ 13. In February 2006, e-mail communication shows Nembhard received second-hand information that one of plaintiff's grantees had complained about her delay in responding to a request for information. Nembhard Decl. ¶ 14; Ex. B to Nembhard Decl. A memo from plaintiff's supervisor notes that on two occasions in March plaintiff failed to follow proper procedure to schedule leave. Ex. F to Nembhard Decl. Defendant also asserts that plaintiff waited more than two months to complete an assignment that should have been delivered to grantees within 30 days. Nembhard Decl. ¶¶ 15-16.

## II.    STANDARD OF REVIEW

Defendant moves to dismiss plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Alternatively, it moves for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant's Rule 12(b)(1) motion for lack of subject matter jurisdiction is based on plaintiff's alleged failure to exhaust her administrative remedies. However, the D.C. Circuit has stated that Title VII's exhaustion requirements are not jurisdictional. See Artis v. Bernanke, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (citing Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519, 527 (D.C. Cir. 2010); see also Ly v. U.S. Postal Serv., 775 F. Supp. 2d 9, 11 (D.D.C. 2011) ("[C]ourts in this circuit tend to treat failure to exhaust as a failure to state a claim rather than as a jurisdictional deficiency.") (internal quotations omitted); Taylor v. Mabus, 685 F. Supp. 2d 94, 96 (D.D.C. 2010) (analyzing failure to exhaust under Rule 12(b)(6)); Hall v. Sebelius, 689 F. Supp. 2d 10, 21-22 (D.D.C. 2009) (same). Hence, the Court will not treat defendant's motion as brought under Rule 12(b)(1).

Defendant also moves to dismiss plaintiff's amended complaint pursuant to Rule 12(b)(6) for failure to state a claim. However, defendant has already filed an answer and engaged in discovery. Moreover, numerous exhibits are attached to the motion papers.  When "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Hence, the Court will treat defendant's motion as brought under Rule 56.

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact. <u>See</u> <u>Celotex</u>
<u>Corp. v. Catrett,</u> 477 U.S. 317, 323 (1986). The moving party may successfully support its
motion by identifying those portions of "the record, including depositions, documents,
electronically stored information, affidavits or declarations, stipulations (including those made
for purposes of motion only), admissions, interrogatory answers, or other materials," which it
believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); <u>see</u>
<u>Celotex</u>, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude
summary judgment, the court must regard the non-movant's statements as true and accept all
evidence and make all inferences in the non-movant's favor. <u>See</u> <u>Anderson v. Liberty Lobby,</u>
<u>Inc.</u>, 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the
"mere existence of a scintilla of evidence" in support of its position. <u>Id.</u> at 252. By pointing to
the absence of evidence proffered by the non-moving party, a moving party may succeed on
summary judgment. <u>Celotex</u>, 477 U.S. at 322. "If the evidence is merely colorable, or is not
significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50
(citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence
on which the jury could reasonably find for the [non-movant]." <u>Id.</u> at 252.

### III.     DISCUSSION

### A.     Motion to Strike

Defendant has filed a motion to strike eight of plaintiff's exhibits. On July 28, 2009,
plaintiff timely filed her memorandum in support of her opposition, which included five exhibits.
Defendant moved for an extension of time to reply, because the memorandum filed by plaintiff
was unreadable. The Court granted defendant's motion and ordered plaintiff to file a "readable

brief in opposition." Minute Order on Aug. 3, 2009. On August 10, 2009, plaintiff filed a readable copy of her brief as well as thirteen exhibits, eight of which defendant now moves to strike. Mot. to Strike at 3. Defendant argues that these eight exhibits were not authorized by the Court's August 3, 2009 Order, Mot. to Strike at 5,[5] but plaintiff states that her opposition brief "always referred to all of [her] exhibits (Exhibits 1-13)," Pl.'s Opp'n Mot. Strike at 4-5. She asserts that not only was her opposition "accidentally converted into an unreadable document," but also "Exhibits 6-13 [were] not converted into a PDF format, and thus, [were] not attached to [her] original pleading." Id. at 4.

"Though the power to strike exhibits from motions for summary judgment derives from Rule 56, the framework of Rule 12(f), which allows pleadings to be stricken, is instructive." Wasserman v. Rodacker, No. 06-1005, 2007 WL 274748, at *2 (D.D.C. Jan. 29, 2007).  Rule 12(f) permits the court to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). Defendant has not claimed that plaintiff's exhibits manifest any of these characteristics. Furthermore, motions to strike under Rule 12(f) are "generally strongly disfavored." Wasserman, 2007 WL 274748, at *2; see also Nugent v. Unum Life Ins. Co. of Am., 752 F. Supp. 2d 46, 51 (D.D.C. 2010); Doeman v. Howard Univ., No. 04-2135, 2006 WL 398917, at *3 (D.D.C. Feb. 12, 2006). Courts instead favor resolving cases on their merits. See Canady v. Erbe Elektromedizin GmbH, 307 F. Supp. 2d 2, 7-8 (D.D.C. 2004) (citing Jackson v. Beech, 636 F.2d 831, 835 (D.C. Cir. 1980)).

Here, plaintiff explains that these exhibits were deleted as part of the same glitch that rendered her original brief unreadable, so it is not even entirely clear that these attachments

---

[5] In arguing that the Court should grant the motion to strike, defendant's reliance on Local Civil Rule 7(b) is misplaced. Rule 7(b) provides that if a party fails to file a memorandum in opposition to a motion within the prescribed time, "the Court may treat the motion as conceded."  Here, defendant does not seek to treat the motion as conceded.

would fall outside of the court's Minute Order.  But in any event, because courts generally disfavor motions to strike and plaintiff did timely submit her original opposition brief, defendant's motion to strike exhibits 6-13 will be denied.

## B.    Exhaustion

In order to bring this Title VII action in federal court, plaintiff must have timely exhausted her administrative remedies. See Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010); Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997). The administrative requirements a plaintiff must meet in order to proceed in federal court under Title VII are set out in the Code of Federal Regulations. Rhodes v. Napolitano, 656 F. Supp. 2d 174, 179-80 (D.D.C. 2009); see 29 C.F.R. §§ 1614.101-110. Defendant moves to dismiss plaintiff's Title VII claims for failure to exhaust administrative remedies as required under 29 C.F.R. § 1614.105(a)(1), which states that "an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." "[A] court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling." Steele v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008) (internal citations omitted).

The scope of a Title VII action is also limited by the underlying administrative complaint. See Nyunt v. Tomlinson, 543 F. Supp. 2d 25, 34-35 (D.D.C. 2008). Only those claims that are contained in the administrative complaint or that are "like or reasonably related" to the allegations of the administrative complaint can be pursued in a Title VII lawsuit. Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (internal citations omitted); see also Bailey v. Verizon Commc'n, Inc., 544 F. Supp. 2d 33, 37-38 (D.D.C. 2008) (noting that "[i]f a plaintiff's EEOC charge makes a class of allegation altogether different from that which she later alleges when seeking relief in federal district court, she will have failed to exhaust administrative remedies").

Such claims "must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." <u>Park</u>, 71 F.3d at 907 (internal quotation marks and citation omitted). The exhaustion requirement provides the EEOC the opportunity to investigate and "serves the important purpose of giving the charged party notice of the claim and 'narrow[ing] the issue for prompt adjudication and decision.'" <u>Id.</u> (quoting <u>Laffey v. Nw. Airlines, Inc.</u>, 567 F.2d 429, 472 n.325 (D.C. Cir. 1976)). Dismissal is required when a plaintiff fails to exhaust her administrative remedies with respect to particular claims. <u>See</u> <u>Rann v. Chao</u>, 346 F.3d 192, 194-95 (D.C. Cir. 2003).

## 1.      Discrimination based on race and/or color

Defendant seems to concede that plaintiff has exhausted her retaliation and hostile work environment claims, at least with respect to termination.[6] However, defendant construes plaintiff's amended complaint to include claims of discrimination based on race and/or color, and contends that plaintiff has failed to exhaust those claims. <u>See</u> Def.'s Mot. at 22-23. To the extent that plaintiff is attempting to claim that her termination was discriminatory based on race and/or color, as opposed to retaliatory, defendant is correct that plaintiff did not exhaust her administrative remedies. The EEOC charge form makes it easy for an employee to identify the nature of the alleged wrongdoing by simply checking the labeled boxes that are provided. When an employee is uncertain which type of discrimination has occurred, she "need only describe it in the text of the charge form." <u>See</u> <u>Carter v. Wash. Post</u>, No. 05-1712, 2006 WL 1371677, at *4

---

[6] Plaintiff's retaliation claim could be construed as including retaliation with respect to two other acts – her unsuccessful mid-year performance rating and the charge of unapproved leave. Am. Compl. ¶¶ 65-74. However, as defendant notes, plaintiff did not seek EEO counseling for either of these claims within the 45-day limit, and so it does not appear that they were exhausted.  <u>See</u> Def.'s Mot. at 29 n.1; <u>see also</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 102 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

(D.D.C., May 15, 2006). On the EEOC charge form underlying this action, plaintiff did not check "race" or "color" as the basis of her discrimination charge, nor does the written explanation in her EEOC complaint describe a suspicion or allegation of discrimination based on race or color. See Def.'s Mot., Attach. 7 ("EEOC Complaint"). The addendum to her EEOC complaint deals exclusively with plaintiff's concern that she was retaliated against for disclosures made during ADR sessions. Id.

Moreover, "an employee who believes that she has been the subject of discrimination must timely (1) contact an agency official "logically connected" with the EEO process (not necessarily a Counselor) and (2) demonstrate an intent to begin the EEO process." Klugel v. Small8, 519 F. Supp. 2d 66, 71-72 (D.D.C. 2007); see also White v. Geithner, 602 F. Supp. 2d 35, 37 n.4 (D.D.C. 2009).  Plaintiff does not claim that she intended to begin the EEO process during her ADR meetings and so those conversations cannot fulfill her exhaustion obligation. Hence, to the extent that plaintiff is seeking to bring discrimination claims based on race and/or color, those claims must be dismissed for failure to exhaust administrative remedies.

**2.      Violation of the Labor Management Agreement**

Count III of plaintiff's amended complaint is titled "Wrongful Termination in Violation of Title VII and the Labor Management Agreement." As defendant points out, Count III mostly restates plaintiff's retaliation and hostile environment claims — that she was harassed and ultimately dismissed for making "protective disclosures." Am. Comp. ¶¶ 82-4. However, to the extent that plaintiff asserts those same claims under the Labor Management Agreement ("Agreement"), they must fail because Title VII provides the exclusive judicial remedy for claims of discrimination and retaliation. See Strong-Fisher v. LaHood, 611 F. Supp. 2d 49, 53 (D.D.C. 2009) (citing Brown v. Gen. Servs. Admin., 425 U.S. 820 (1976)).

Plaintiff also alleges that defendant breached the Agreement in a number of ways, including the failure to give plaintiff an "opportunity to improve and correct any performance deficiencies" or provide a representative with whom plaintiff could discuss the reasons for her separation. Am. Compl. ¶¶ 86, 89. Plaintiff also asserts in her opposition brief that "[d]efendant violated Article 13 of the Labor Management Agreement by failing to provide [p]laintiff with a performance plan and a Performance Improvement Plan" and "by failing to provide [p]laintiff with a final performance appraisal" Pl.'s Opp'n at 23 & Attach. 4 ("Agreement"). These allegations read less like discrimination claims and more like breach of contract allegations.

"As a general rule, an employee-plaintiff who is subject to a collective bargaining agreement must seek to resolve their contract disputes under the agreement's grievance and arbitration procedures before he or she can maintain a suit against his or her union or employer." Plain v. AT&T Corp., 424 F. Supp. 2d 11, 23 (D.D.C. 2006) (citing Republic Steel Corp. v. Maddox, 379 U.S. 650, 653 (1965), and Commc'n Workers of Am. v. AT&T, 40 F.3d 426, 434 (D.C. Cir. 1994)); see also Carson v. Sim, 778 F. Supp. 2d 85, 94 (D.D.C. 2011).

Here, Article 21 of the Agreement covering plaintiff's employment sets forth a grievance procedure for purported breaches of the Agreement.  See Agreement at 55-59. Defendant asserts, and plaintiff does not contradict, that plaintiff did not file any grievance or otherwise follow the procedure set forth in Article 21 regarding her breach of contract claims. Def.'s Reply to Pl.'s Opp'n at 11. Hence, plaintiff failed to exhaust her remedies under the Agreement and Count III will be dismissed. See Bush v. Clark Constr. & Concrete Corp., 267 F. Supp. 2d 43, 46-47 (D.D.C. 2011) (dismissing the plaintiff's claim for failure to exhaust because employees covered by a collective bargaining agreement must "attempt to use the grievance procedures previously agreed upon by the employer and union before resorting to any other form of redress").

## C.      Retaliation

Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008). Courts have considered retaliation claims under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-06 (1973). Under this framework, a plaintiff must first establish a prima facie case by a preponderance of the evidence. See id at 802. For a retaliation claim, this means a plaintiff must show: "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007)). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its action. See Smith v. District of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005). In asserting its explanation, an employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981) (citation omitted).

However, when a defendant offers a legitimate, non-retaliatory reason for its actions, "the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494

(D.C. Cir. 2008). Rather, the sole inquiry becomes whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the plaintiff on a prohibited basis. See Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008). In other words, the McDonnell Douglas burden-shifting framework essentially disappears and the only remaining issue is whether the employer retaliated against the employee. See Jones, 557 F.3d at 678. However, in evaluating whether plaintiff may defeat summary judgment, "the Court considers all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of [retaliation], any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful retaliation), and any properly considered evidence supporting the employer's case." Williams v. Dodaro, 806 F. Supp. 2d 246, 256-57 (D.D.C. 2011); see also Jones, 557 F.3d at 679; Hill v. Kempthorne, 577 F. Supp. 2d 58, 64 (D.D.C. 2008).

Plaintiff claims that she told defendant's ADR team that her supervisor "show[ed] preferential treatment to two of her co-workers that were female and Caucasian," Am. Compl. ¶ 17, and that the negative treatment she received could be "because of her race (African American) or her color (fair-skinned) or [her supervisor] simply did not like her," Am. Compl. ¶ 21. She asserts that she was then fired in retaliation for her "protective disclosures." Pl.'s Opp'n at 10. Defendant, however, offers an account of several legitimate, non-retaliatory reasons for terminating plaintiff:

> In sum, [p]laintiff had difficulties in communicating effectively with her co-workers and grantees. She failed to respond to customer inquiries in a timely fashion. She struggled with her interpersonal skills with her supervisor and had a history of taking unscheduled leave without complying with appropriate leave procedures.

Def.'s Mot. at 28-29. The Court, then, looks to the totality of the evidence in the record, including the strength of the prima facie case, to determine whether defendant's asserted justification for plaintiff's termination merely disguises retaliation. Williams, 806 F. Supp. 2d at 256-57; Jones, 557 F.3d at 679.  Here, Williams' prima facie case is weak. Although her termination qualifies as an adverse personnel action, the other aspects of the prima facie case – whether plaintiff engaged in protected activity and the presence of a sufficient causal link – are absent.

Defendant argues that plaintiff cannot establish a claim of retaliation since "ADR is not protected activity under Title VII." Def.'s Mot. at 23. However, even informal accusations of discrimination can be protected activity under the law. See Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 93 n.18 (D.D.C. 2006); Rattigan v. Gonzales, 503 F. Supp. 2d 56, 77 n.7 (D.D.C. 2007) ("[O]pposition to an unlawful employment practice qualifies as protected activity even if it may have occurred outside of the EEO context.") (citing Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006)) (internal quotation marks omitted)).

Still, not every employee's complaint receives protection under Title VII; the complaint must in some way allege unlawful discrimination. See Broderick, 437 F.3d at 1232 (citing instances where courts have found lack of protected activity even where comments were made by complainants referring to race or gender, but where discrimination was not alleged). For example, the court in McIntyre v. Peters, found that an employee had not engaged in protected activity where the only support for his claim was the assertion in his motion that he had met with his supervisor and "'questioned [d]efendant's favoritism of a white male.'" 460 F. Supp. 2d 125, 134 (D.D.C. 2006) (quoting Pl.'s Opp'n at 9). The court noted that there was "no factual support for the assertion in plaintiff's pleadings." Id. (emphasis in original); see also Coleman v. Potomac

Elec. Power Co., 422 F. Supp. 2d 209, 213-14 (D.D.C. 2006) (plaintiff had not presented any evidence to create a genuine issue of fact on whether complaints to his employers about the workplace constituted protected activity when he stated for the first time in his opposition brief that he was being harassed for "participat[ing] in activity protected under Title VII"). Williams's claim of protected activity is similarly vague and unsubstantiated.

Plaintiff repeatedly asserts that Nembhard retaliated against her because she made "protective disclosures." See Pl.'s Opp'n at 10.  But plaintiff only briefly mentions in her amended complaint that she raised a vague concern with her employer that her supervisor's harassment might be based on her race or color, and that Nembhard's "behavior toward her appeared to be personal but she was unsure whether it was because of her race (African American) or her color (fair-skinned) or Nembhard simply did not like her". See Am. Compl. ¶¶ 17, 21.  Plaintiff offers no evidence to corroborate that discussion, while defendant proffers the declarations of plaintiff's supervisor, the ADR facilitator, and the Employee Relations Specialist who all state that plaintiff never raised the subject of racial discrimination with them. Nembhard Decl. ¶ 18; Ovca Aff. ¶ 13; Ex. 4 to Nembhard Decl. ¶ 11 (Decl. Employee Relations Specialist) ("HR Decl."). If she had, the ADR facilitator and Employee Relations specialist both say they would have recommended that plaintiff contact CNCS's EEO office. Ovca Aff. ¶ 13, HR Decl. ¶ 12; see Coleman, 422 F. Supp. 2d at 213-14 (finding that plaintiff had not presented enough evidence to create a genuine issue of material fact on whether meetings with defendants constituted protected activity where declarants maintained that they would have alerted the appropriate personnel if plaintiff had made the alleged complaints in meetings with them.).

In responding to a summary judgment motion, the "non-movant's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or

other competent evidence setting forth specific facts showing that there is a genuine issue for

trial." Bailey v. Henderson, 94 F. Supp. 2d 68, 71 (D.D.C. 2000) (citing Fed. R. Civ. P. 56(e);

Celotex, 477 U.S. 317). As in cases such as McIntyre, 460 F. Supp. 2d at 134, and Coleman, 422

F. Supp. 2d at 213-14, plaintiff has not presented enough evidence to create a genuine issue of

material fact on whether her conversations constituted protected activity. See Anderson, 477 U.S.

at 255.

Moreover, even assuming plaintiff could demonstrate that she engaged in protected

activity, she fails to provide sufficient evidence from which a reasonable jury could find a causal

connection between her August 2006 dismissal and the alleged protected activity that took place

around March 2006. See Glenn v. Bair, 643 F. Supp. 2d 23, 30-31 (D.D.C. 2009); Cooke v.

Rosenker, 601 F. Supp. 2d 64, 79 (D.D.C. 2009) (granting summary judgment on retaliation

claim because plaintiff failed to establish a causal relationship between her involvement in

protected activity and the adverse employment action). Here, plaintiff provides no direct

evidence of a connection between the alleged protected activity and her termination. In the

absence of direct evidence, an inference of a causal connection between protected activity and an

adverse employment action may be established on a "showing that the employer had knowledge

of the employee's protected activity, and that the adverse personnel action took place shortly

after that activity." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985); see also Holcomb v.

Powell, 433 F.3d 889, 903 (D.C. Cir. 2006); Brodetski v. Duffey, 141 F. Supp. 2d 35, 42-43

(D.D.C. 2001) ("By showing both knowledge and proximity in time, plaintiff may establish the

causal connection needed for a prima facie case of retaliation."). However, plaintiff cannot

establish a particularly close temporal proximity between her comments on race and color and

her ultimate dismissal.

Plaintiff's disclosures to her employer's HR and ADR offices took place between January and March 2006, Am. Comp. ¶¶ 16-23, but she was not released from her employment until August 2006, id. ¶ 36. While courts have not definitively "established the maximum time lapse between protected Title VII activity and alleged retaliatory actions," Brodetski, 141 F. Supp. 2d at 43, action which occurs more than three months after the protected activity is not likely to qualify for such a causal inference. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam) (citing with approval circuit cases finding three and four months to be too temporally remote to establish causation); see also Jarmon v. Genachowski, 720 F. Supp. 2d 30, 44 n.17 (D.D.C. 2010) (collecting cases that show courts in this Circuit have often stated that three months is the outer limit). The gap of five months or more between plaintiff's disclosures and her termination undermines any causal inference.

Furthermore, plaintiff provides no evidence that her supervisor, who made the termination decision, had knowledge of her protected activity. See Talavera v. Shah, 638 F.3d 303, 313 (D.C. Cir. 2011). In her amended complaint plaintiff states numerous times that she was retaliated against for "protective disclosures" that she made during her one-on-one session with her supervisor, Am. Compl. ¶¶ 30, 37, but never claims that she referred to race or color discrimination in that discussion. Nor does she suggest that her supervisor was informed of the race- or color-related comments that she supposedly made in her discussion with the ADR facilitator and Human Capital Specialist. The five-month gap between plaintiff's disclosures and her termination together with the lack of evidence that her supervisor even knew about the protected activity further weakens any reasonable inference of a retaliatory motive, particularly in light of defendant's abundant evidence of legitimate, non-retaliatory reasons for its actions. See Lester v. Natsios, 290 F. Supp. 2d 11, 27 (D.D.C. 2003).

Plaintiff attempted to show that defendant's multiple legitimate, non-retaliatory reasons for her termination were false by submitting evidence to demonstrate that her work ethic and job performance were not substandard. See Pl.'s Opp'n at 18-20. She points to affidavits from co-workers that testify to her positive work ethic and job performance, Pl.'s Opp'n, Exs. 3-5; her earlier "satisfactory" performance evaluations, Pl.'s Opp'n, Ex. 8, Attach. A; and the performance evaluations of other co-workers who received similar criticism from their supervisor but were not rated as unsatisfactory or fired, id., Ex. 13. However, positive evaluations of plaintiff's work along with testimony from co-workers does not necessarily prove that an employer's statement about plaintiff's poor performance is pretext. See Bennett v. Solis, 729 F. Supp. 2d 54, 70 (D.D.C. 2010) (granting employer's summary judgment motion despite plaintiff's evidence that her work performance was satisfactory).

Moreover, plaintiff fails to respond to defendant's other justifications for her termination. For example, plaintiff does not address defendant's assertion that she submitted a report at least a month after it was due. See Nembhard Decl. ¶¶ 15-16; Ex. C to Nembhard Decl. There is also no disagreement that plaintiff and her supervisor had a tense and hostile relationship well before plaintiff's conversation with the ADR team. See Am. Compl. ¶¶ 11-15; Nembhard Decl. ¶¶ 10-12. In Vatel v. Alliance of Auto. Mfrs., 627 F.3d 1245, 1247-1249 (D.C. Cir. 2011), the court found that the person who hires an individual is unlikely to fire that same person for an invidious motive when there is uncontroverted evidence of incompatible working styles. Plaintiff has made it clear that she has had problems with her supervisor's management style since at least January 2006. Am. Compl. ¶¶ 11-15. Her amended complaint states that her supervisor "exhibited a very hostile attitude toward her and other staff" and that "her bad management style was causing low morale among the entire staff." Id. at ¶¶ 11-13. Not only do these claims show that plaintiff and

Nembhard did not work well together even before the alleged protected activity, but also that the alleged mistreatment was not particular to plaintiff.

Finally, "where an employer has a strong record of equal opportunity employment, any inference of discrimination arising from the discrediting of the employer's explanation may be a weak one, and in some cases not strong enough to let a reasonable factfinder conclude that discrimination has occurred at all." Aka v. Washington Hosp. Center, 156 F.3d 1284, 1291 (D.C. Cir. 1998). Nembhard is an African-American woman who says in her declaration that from 2005-2006 she supervised nine Program Officers, including one other African-American woman in addition to plaintiff.[7] Nembhard Decl. ¶ 7-8. These facts further undermine any inference that plaintiff was retaliated against for opposing the discriminatory practices of her supervisor.

An employer is entitled to summary judgment as a matter of law "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (2000) (citation omitted). Assessing all the relevant circumstances, and reviewing the entire record, plaintiff has failed to produce sufficient evidence from which a reasonable jury could find that defendant retaliated against plaintiff on a prohibited basis. Defendant, on the other hand, has presented substantial support for its legitimate, non-retaliatory reasons for dismissing plaintiff from her employment. Hence, the Court will grant defendant's summary judgment motion as to plaintiff's retaliation claim.

---

[7] Plaintiff notes that the other African-American woman under Nembhard's oversight during this time period was located in Dallas, Texas and worked in the D.C. office five or six times a year. Am. Compl. ¶ 8 n.1.

### D.      Hostile Work Environment

Plaintiff's hostile work environment claim also fails.  Her claim appears to be based on

retaliation, rather than on discrimination based on race or color. A hostile work environment can

amount to retaliation under Title VII. Hussain v. Nicholson, 435 F.3d 359, 366-67 (D.C. Cir.

2006); see also Singletary v. District of Columbia, 351 F.3d 519, 526 (D.C. Cir. 2003).

 To prevail on such a claim, plaintiff must show that her employer subjected her to

"discriminatory intimidation, ridicule, and insult" of such "sever[ity] or pervasive[ness] [as] to

alter the conditions of [her] employment and create an abusive working environment." Harris v.

Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477

U.S. 57, 65-67 (1986)) (internal quotation marks omitted). To determine whether a hostile work

environment exists, courts should consider "the totality of the circumstances, including the

frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes

with an employee's work performance." Baloch, 550 F.3d at 1201; Franklin v. Potter, 600 F.

Supp. 2d 38, 76-77 (D.D.C. 2009)

In her amended complaint, plaintiff lists the grievances that she believes created a hostile

work environment following her disclosures. See Am. Compl. ¶ 55. She states that her

supervisor: (1) gave her an unjustified unsatisfactory performance evaluation; (2) failed to talk to

her; (3) charged her with absence without leave for a doctor's appointment; (4) required plaintiff

to provide advance notice for doctors' appointments; (5) failed to provide any feedback

regarding her unsatisfactory employment; and (6) fired plaintiff without giving her a chance to

improve her performance. Id. These allegations closely track her retaliation claim. Allowing

standard disparate treatment claims to be converted into a contemporaneous hostile work

environment claim runs the risk of significantly blurring the distinctions between the elements

that underpin each cause of action and the kinds of harm each was designed to address. <u>See</u> <u>Rattigan</u>, 503 F. Supp. 2d at 82 (internal citation omitted). As such, plaintiff cannot re-purpose the same discrete acts she claims are retaliatory to assert a broader hostile environment cause of action. <u>See</u> <u>Keeley v. Small</u>, 391 F. Supp. 2d 30, 51 (D.D.C. 2005); <u>accord</u> <u>Smith v. Jackson</u>, 539 F. Supp. 2d 116, 138 (D.D.C. 2008) ("[I]nsofar as [p]laintiff attempts to base his hostile work environment claim on his [compressed work schedule] revocation and AWOL charge, he cannot simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim."). <u>See also</u> <u>Nurriddin v. Bolden</u>, 674 F. Supp. 2d 64, 94 (D.D.C. 2009); <u>Franklin</u>, 600 F. Supp. 2d at 76-77.

None of plaintiff's allegations, moreover, whether considered alone or cumulatively, meet the "demanding standards" of a hostile work environment. <u>See</u> <u>Sewell v. Chao</u>, 532 F. Supp. 2d 126, 141-42 (D.D.C. 2008). A hostile work environment claim is not a cause of action for the "ordinary tribulations of the workplace," <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (internal citations omitted), and "[n]ot everything that makes an employee unhappy is an actionable adverse action," <u>Broderick</u>, 437 F.3d at 1233 (internal citation and quotation marks omitted). This standard is designed to be "sufficiently demanding to ensure that anti-discrimination statutes do not become 'general civility code[s].'" <u>Faragher</u>, 524 U.S. at 788 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)). Plaintiff's work environment was hardly ideal and her relationship with her supervisor was strained, but her hostile environment allegations boil down to complaints based on a lack of communication with her supervisor, the handling of her sick leave, and an unsatisfactory performance evaluation. These common workplace challenges do not show an environment so pervaded with discriminatory abuse as to alter the conditions of plaintiff's employment. <u>See</u> <u>Nurriddin</u>, 674 F.

Supp. 2d at 94 ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); Smith, 539 F. Supp. 2d at 137-39 (finding that plaintiff's allegations that his supervisor had called him into his office numerous times a day, charged him with AWOL, and physically blocked his path when he sought to leave the office did not rise to the level of severe and pervasive treatment sufficient to alter the conditions of his employment). Accordingly, the Court will grant defendant's summary judgment motion as to plaintiff's claim of a hostile work environment.

### E.     Other Claims

Plaintiff's opposition references claims of disability discrimination under the Americans with Disabilities Act (ADA), Pl.'s Opp'n at 19, and violations of the Whistleblower Protection Act and the No Fear Act, id. at 10-11. Not only are these claims not clearly raised in plaintiff's amended complaint,[8] but, to the extent her amended complaint could be construed as making such claims, they nonetheless fail. Like Title VII, Title I of the ADA also has an exhaustion requirement. See 42 U.S.C. §§ 12111-12117. As with her claims based on race or color, plaintiff's formal EEOC complaint did not raise any concerns as to discrimination based on a disability and so she has not satisfied the exhaustion requirement.

To the extent that plaintiff intended to bring a claim under the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302(b) ("WPA"), this Court lacks jurisdiction to hear it. Plaintiff's references to "protective disclosures" of "mismanagement," Am. Compl. ¶¶ 23, 37-38, 84; Pl.'s Opp'n at 6, 10, and her citation to "5 U.S.C. § 2302(b)," Am. Compl. ¶ 88 & n.7, suggest a claim

---

[8] Where the amended complaint does not make a claim, plaintiff cannot add a new claim through an opposition brief. See Winder v. District of Columbia, 555 F. Supp. 2d 103, 108, 111 (D.D.C. 2008); Mazloum v. District of Columbia, 442 F. Supp. 2d 1, 12 n.7 (D.D.C. 2006); Arbitraje Casa de Cambio v. U.S. Postal Serv., 297 F. Supp. 2d 165, 170 (D.D.C. 2003).

under the WPA, which provides federal employees with protection against agency reprisals for

disclosing gross mismanagement, see Stella v. Mineta, 284 F.3d 135, 142 (D.C. Cir. 2002)

(citing 5 U.S.C. § 2302(b)(8)). However, she did not proceed with the proper administrative

process for a WPA claim. An employee who believes she is the victim of an unlawful retaliation

under the WPA must first bring her claim to the Office of Special Counsel ("OSC"). See Weber

v. United States, 209 F.3d 756, 758 (D.C. Cir. 2002) (citing 5 U.S.C. § 1214). "Under no

circumstances does the WPA grant the District Court jurisdiction to entertain a whistleblower

cause of action brought directly before it in the first instance." Stella, 284 F.3d at 142. It is

uncontested that plaintiff did not file a complaint with the OSC. Accordingly, this court lacks

jurisdiction over any claim brought pursuant to the WPA.

Finally, plaintiff's opposition makes repeated references to the "No Fear Act." Pl.'s

Opp'n at 10-11, 16-18, 20. However, that Act does not provide a private cause of action. See

generally Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002

("No Fear Act"), 5 U.S.C. § 2301 et seq.; see also Glaude v. United States, 248 Fed. App'x. 175,

177 (Fed. Cir. 2007) ("Of the few courts that have considered claims made under the No Fear

Act, none have found that the Act provides a private cause of action or creates a substantive right

for which the government must pay damages."); Baney v. Mukasey, No. 06-2064, 2008 WL

706917, at *6-7 (N.D. Tex. Mar. 14, 2008) (finding no private cause of action).

### F.   Motion to Appoint Counsel

Given the resolution of defendant's summary judgment motion, the Court will deny as moot

plaintiff's motion for an extension of time to retain new counsel and the motion to appoint

counsel. See Ceasar v. CBS Headquarters Co., No. 06-2140, 2008 WL 313146, at *1 n.1 (D.D.C.

Feb. 4, 2008) (denying plaintiff's motion to appoint counsel where the court granted defendants'

motion to dismiss); <u>Hill v. Barry</u>, No. 87-1660, 1987 WL 18997, at *1 (D.D.C. Oct. 16, 1987)

(same). It is worth noting that all of plaintiff's briefings relevant to defendant's summary

judgment motion had already been filed before plaintiff's counsel's appearance was terminated

on November 13, 2009. Def.'s Resp. to Pl's Mot. Appoint Counsel ¶ 2. Hence, she had the

assistance of counsel in framing her claims and in responding to defendant's motion for

summary judgment.  <u>See</u> <u>Blackledge v. Brady</u>, No. 88-1606, 1990 WL 95566 at *2-3 (D.D.C.

June 25, 1990) (court relied on fact that plaintiff was represented by counsel at the administrative

stage of proceedings in concluding that plaintiff was able to adequately present her case without

further assistance of counsel).

## IV.    CONCLUSION

For the reasons given above, the Court grants defendant's motion for summary judgment

on all of plaintiff's claims. A separate order accompanies this Memorandum Opinion.


**SO ORDERED**


_____
/s/
JOHN D. BATES
United States District Judge

Dated:  <u>August 13, 2012</u>